**UNITED STATES of America**

v.

**ONE 55 FOOT FISHING VESSEL ... KNOWN AS "THE SOLE".**

**Civ. A. No. 82–654Mc.**

United States District Court,
D. Massachusetts.

March 18, 1987.

Frederick E. Dashiell, Asst. U.S. Atty., Boston, Mass., for plaintiff.

Joseph Marchese Jr., Revere, Mass., and Robert T. Gill, Dale A. Coggins, Parker, Coulter, Daley & White, Boston, Mass., for claimant Pasquale Alba, Pres. and Dir. of Sole Fisheries.

### FINDINGS OF FACT and CONCLUSIONS OF LAW

McNAUGHT, District Judge.

Jurisdiction is founded on the provisions of 28 U.S.C. § 1355. This is an action in rem for the forfeiture of the fishing vessel "The Sole" under 21 U.S.C. § 881(a)(4).

The first issue to be determined was whether, prior to the seizure of the vessel, the government had reasonable cause to believe that the vessel was used as a conveyance for the transportation of marijuana. By reason of the facts that I found, I answered this first question in the affirmative.

■ Where a conveyance such as a vessel is used or intended to be used to transport a controlled substance such as marijuana, it is subject to forfeiture.

The conclusion that the government had "reasonable cause" is founded upon evidence which I accepted at the trial of the matter—evidence which established that a Drug Enforcement Administration Agent named Peter Vinton was told by a man named Spiridon Athanasidis that he (Athanasidis) had participated in transferring a load of marijuana from a "mother ship" to a fishing vessel; that the marijuana then was transported into Gloucester, Massachusetts aboard that vessel; that Athanasidis and a man named "Sal the Fisherman" were both aboard that vessel at the time; that "Sal" owned the vessel; that when the transfer from the mother ship was taking place, the fishing vessel suffered damage to its port side as the boats "rolled into each other" in rough seas; that the off-load took place in June of 1977. Athanasidis described the boat as being "red, white and blue", about 60 feet long. It had one mast, and docked at the Boston Fish Pier. Athanasidis' statements were admitted for the fact of their utterance to Mr. Vinton, as bearing on the issue of reasonable cause.

Prior to the vessel's seizure, Mr. Vinton on several occasions took Athanasidis to the Fish Pier, but he did not see and identify the vessel. At one time "Spiro" was in Baltimore to testify before a grand jury, and the Agent, here in Boston, took photographs of the SOLE, the SICILY and various persons including Sal Alba. The photos were sent to Baltimore and were shown to Athanasidis there. When shown pictures of both vessels, he chose and identified the SOLE as the one on which he and "Sal the Fisherman" had been involved in the off-load. He said it was the smaller of the two vessels pictured. He never, however, identified the SOLE by name.

After the seizure of the vessel, the Agent went to view the SOLE in South Boston with Mr. Athanasidis. He showed the agent "details" which persuaded him that the SOLE was the vessel he had been on; that the Caterpillar engine had been replaced; that a shed on the back of the boat had been removed; that there was a new bulkhead on the boat, and that one of the Loran radios was missing. He described extensive repairs to the pilot house, which weren't present when he was on the boat. He described changes in the kitchen—the repair of a table. He showed the agent where he had placed a letter (a letter he was to deliver to the captain of the mother ship). The agent went to the Coast Guard, and the Bureau of Fisheries and obtained records. The Agent accepted Athanasidis' testimony of the differences as indicative of and confirmatory of identification of the SOLE as the boat which took part in the off-load.

Another view took place during the trial of *United States v. Drougas and others*

before Judge Keeton of this court. At this second view (when Mr. Athanasidis was not present) the paint was stripped (at the request of Attorney Joseph Balliro) from the port side. Mr. Athanasidis had shown the agent where damage had taken place to the vessel during the off-load. He described the collision that had taken place in the middle of the night at sea. When the stripping of the paint was done, and the bare wood was exposed on the port side, a plank of "new wood" was found to have been inserted at that spot on the SOLE.

■ By reason of the foregoing, I found no problem at the trial of the matter, in finding probable cause for the seizure and issued a certificate to that effect.

It is true, as argued by the defendant, that errors were made by Agent Vinton. For example, when application was made for the issuance of the warrant, Mr. Vinton represented that Salvatore (Sal) Alba was an officer of the corporation that owned the vessel, and was an officer in June 1977 when the off-load occurred. That was a mistake. I do not find it to have been a deliberate misrepresentation, and there was adequate ground and probable cause for the seizure of the SOLE in March of 1982. There was *cause to believe* that it was the vessel that had been used in the off-load. 21 U.S.C. § 881(b). More than mere suspicion was involved that there was a nexus between this property and the crime. The information supplied by the informant was adequate and sufficiently reliable to warrant the *belief* by the Agent that this was the vessel, and not another.

The government, then, carried its initial burden. Now the burden fell upon defendant to establish by a preponderance that the vessel was not used or intended to be used to facilitate the transportation of the marijuana. Having heard the evidence I find that defendant has carried the burden. The facts follow.

Sole Fisheries was incorporated in 1972, and purchased the SOLE that year. The corporation was owned partly by Anthony Alba and Salvatore (Sal), brothers of Pasquale (Pat). In 1973 Anthony's interest as an owner ceased, and Sal's interest came to

an end in 1975 when he and brother Pat did not see eye to eye about how the boat should be run. After that breakup, the boat was owned by Pat and his wife Jean. In 1975 Sal bought the SICILY. Pat testified and I find that after the 1975 problem between him and Sal he did not allow Sal to use the SOLE.

The annual reports filed by the Sole Fisheries corporation with the Secretary of State established that, contrary to the belief of Agent Vinton who checked them, Sal Alba was *not* listed as a corporate officer as of June, 1977. He was neither officer nor director from 1975 on. Mr. Vinton's affidavit, submitted in support of the application for the warrant, read in pertinent part: "I've examined the relevant corporate records and Coast Guard documentation and determined that in June, 1977, when the smuggling venture occurred, Salvatore Alba was an officer of the corporation that owns a boat called the Sole. The informant told me the boat he was on is red, white and blue and docked at the Boston Fish Pier. The Sole fits that description". Obviously, in retrospect, if all of the bases for the deduction were *essential*, probable cause would not have existed, but as recited hereinbefore, the representations, in part, were error, rather than falsifications. There was no knowing, intentional or reckless disregard of the truth.

■ I find on the evidence submitted before me that it was probably *not* the SOLE which was used to transport the marijuana. It probably was the SICILY. The SOLE indeed was, as was the off-load vessel, a fishing boat. It was, as was the off-load vessel, painted red, white and blue. The same is true of the SICILY, however. Indeed, the same is true, with respect to colors, of most of the "Italian fleet" operating out of Boston and Gloucester. The SICILY was owned by Sal Alba, who was convicted of taking part in the smuggling venture.

Damage was suffered by the off-load vessel when it collided with the mother ship, and when a portion of the SOLE's paint was stripped during the trial before Judge Keeton, the stripping revealed that

two pieces of planking apparently were "new". Exhibits 8, 9 and 11A, photographs in color, lead me to conclude that these planks, about three feet in length, and apparently two by six inches, were inserted in the second and third strakes below the gunwale just forward of the pilot house. This, of course, is a "plus" for the government's contention with respect to the identity of the boat involved in the off-load, since Agent Vinton was told by Athanasidis that this was the point of impact on the off-load boat.

In the early summer of 1977, after the off-load, work was done on the SICILY (from June 4 to June 24, 1977) at the Gloucester Marine Railway. Harry Cusick, manager of the boatyard, testified at this trial, and produced the records involving the work on the SICILY: extensive work on the port side planking, plank shear, waist bulwarks, rail and stanchions. Mr. Cusick expressed the opinion that the "top" of the port side (the portion above the scupper strake) was contacted and bent inward. It and the deck acted as a fulcrum, and the bottom portion tended to be forced out, before fracturing. That allowed water to come through the skin of the vessel and accounted for the leaking found in the vessel when it was brought in to the boatyard. He described the repairs that were done from just aft of the forward whaleback to just aft of the pilot house. This damage was consistent, then, with a collision between the "mother ship" and the off-load vessel—more consistent than the small area of "new" planking on the SOLE. I find in terms of probabilities that it was the SICILY that suffered the damage occasioned by the collision, not the SOLE. Defendant's Exh. F, while a somewhat indistinct photo, is sufficiently clear to show, even after the vessel was returned to the water, that a large portion of the planking still had to be added.

Work was done at the same boatyard on the SOLE in the period of May and June in 1977, but none of it had to do with the sides of the boat. A plywood pilothouse was fabricated.

Sal Alba testified, and I am persuaded, that he was involved in the smuggle, and that he used his own vessel, the SICILY. The SICILY was damaged in the smuggling operation when it was struck by the mother ship, and the damage done was repaired at the Gloucester Marine Railway.

Pasquale (Pat) and Jean Alba, after the problem with Sal in 1975, did not allow Sal to use the SOLE. At no time after that, including the time of the smuggle in May of 1977, did they give permission to Sal to use the SOLE for any purpose. During the months of May and June 1977 only Pat had the key which was needed to get into the pilothouse of the SOLE and to start the engine. While the SOLE was docked in Boston, the crew went to it in the morning. Sal Licata, a crew member, was paid extra to check the vessel each night, and both mornings and nights on holidays and Sundays. The SOLE was accounted for by Pat and Jean Alba through the months of May and June. It was not used in the smuggle.

I conclude and rule that the defendant's burden has been carried in this proceeding; that this vessel, the SOLE, was not used to transport the marijuana, and hence, is not subject to forfeiture.

If it became pertinent, I would find as fact that Pasquale and Jean Alba did all that could reasonably be required of them to prevent unauthorized persons from using their craft at any time.

Judgment for the defendant.